IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MICHELLE PULLEY,

        Plaintiff,                    CV-09-3025-ST

    v.                                OPINION AND ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Michelle M. Pulley ("Pulley"), seeks judicial review of the Social Security Commissioner's ("Commissioner") final decision denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 USC §§ 401-33 (2008). This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final

1 - OPINION AND ORDER

orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #11).  For the reasons set forth below, the Commissioner's decision is AFFIRMED.

## ADMINISTRATIVE HISTORY

Pulley protectively filed for SSI on March 30, 2006 alleging a disability onset date of May 1, 2004, based on a bipolar disorder, manic depression, seizures, agoraphobia, fibromyalgia, and back problems.  Tr. 84-87, 97.[1]  Her application was denied initially and on reconsideration.  Tr. 60-70.  A hearing was held before Administrative Law Judge ("ALJ") John Madden, Jr., on July 10, 2008.  Tr. 20-59.  The ALJ issued a decision on August 11, 2008, finding Pulley not disabled.  Tr. 11-19.  The Appeals Council denied Pulley's request for review on February 24, 2009, making the ALJ's decision the Commissioner's final decision.  Tr. 1-5.  Pulley now seeks judicial review of the Commissioner's decision.

## BACKGROUND

Pulley was born in 1967 and was 40 years old at the time of the hearing before the ALJ.  Tr. 25, 84.  She finished the eleventh grade with special education classes.  Tr. 25, 102.  Her past relevant work includes positions as a dishwasher, laundry attendant and housekeeper.  Tr. 98.

Pulley has a seizure disorder.  On February 28, 2006, Pulley was transported to the emergency room by ambulance because she experienced three minor seizures, followed by a full convulsive seizure which was only relieved by her husband splashing water on her.  Tr. 179.  The responding physician documented that Pulley reported a history of seizures, both petit and grand mal, which were most often triggered by stress and anxiety.  Tr. 179-80.

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on July 23, 2009 (docket #14).

At the request of Oregon Department of Human Services ("DHS"), Gregory A. Cole, Ph.D., conducted a psychodiagnostic evaluation of Pulley on July 7, 2006. Tr. 194-200. As part of his review, Dr. Cole interviewed Pulley and her husband, conducted several objective tests, made behavioral observations, and reviewed Pulley's medical records. Tr. 194. In evaluating Pulley's medical history, Dr. Cole noted that Pulley indicated that she could not work at all because she had lots of seizures and a history of fibromyalgia and epilepsy. Tr. 195-96. He observed that Pulley exhibited symptoms and intellectual deficits consistent with bipolar disorder, anxiety disorder, cannabis abuse, personality disorder, and learning disorders in the areas of reading, writing, and mathematics. Tr. 198. He also found that she exhibited intellectual limitations which were consistent with a diagnosis of borderline intellectual functioning, but that such a diagnosis was premature and required further assessment. *Id*. He reported that Pulley gave up easily on tasks, had slow overall pace on completing tasks, exhibited below average immediate and delayed memory capabilities, and had mild problems completing simple multiple-step tasks. *Id*. From these results, Dr. Cole "presumed that her uncontrolled seizures, intellectual limitations/learning disorders, and level of anxiety/emotional lability would be the primary factors which would impact her overall level of vocational success." Tr. 198-99. He also recommended that further medical evaluation was needed to determine Pulley's specific physical limitations in regard to her seizures. Tr. 199.

On July 19, 2006, Bill Hennings, Ph.D., completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment. Tr. 201-18. Dr. Hennings concluded that Pulley suffered from the following medically determinable impairments that did not precisely satisfy the diagnostic listing criteria: borderline intellectual functioning, bipolar

disorder, anxiety disorder, personality disorder NOS, and cannabis abuse. Tr. 201-10. He found Pulley moderately limited in her ability to understand and remember directions, carry out detailed instructions, interact appropriately with the general public, and travel in unfamiliar places or use public transportation. Tr. 215-16. Dr. Hennings concluded that Pulley's impairments caused mild to moderate degrees of functional limitation and that she should be able to do "simple, routine, non-hazardous work that does not require frequent public contact." Tr. 211, 213. On November 6, 2006, Peter LeBray, Ph.D., reviewed Pulley's file, noting that he gave "substantive weight" to Dr. Cole's opinions, and affirmed Dr. Hennings' assessment. Tr. 232.

On July 21, 2006, Richard Alley, M.D., completed a Physical Residual Functional Capacity Assessment, indicating that Pulley's primary diagnosis was seizure disorder. Tr. 219-26. Dr. Alley determined that Pulley should avoid concentrated exposure to hazards, but otherwise had no environmental, exertional, postural, manipulative, visual, or communicative limitations. Tr. 220-23. He reported that the medical records indicated that Pulley "has epilepsy that is controlled with medication," but had no other physical impairments. Tr. 224. He further found that Pulley was having seizures approximately twice a year, with or without medication, and that the seizures appeared to be triggered by stress. Tr. 226. From this information, Dr. Alley concluded that Pulley should be able "to engage in non-hazardous activity." *Id*. On November 2, 2006, Martin Kehrli, M.D., reviewed all the evidence in the file and affirmed Dr. Alley's assessment. Tr. 231.

Pulley has regularly seen Michelle Thomas, M.D., at the Open Door Family Practice for medication management for her seizure disorder, chronic pain, and anxiety. Tr. 237-56. On

December 13, 2006, Pulley presented for follow-up for her prescriptions of Dilantin, Flexeril, and Xanax. Tr. 247. At that time, Pulley was "having a hard time affording her medications" and could not afford to see the neurologist or dentist because she had no medical insurance. *Id*. In February 2007, Dr. Thomas prescribed pain medication for a dental abscess. Tr. 245-46. In June 2007, Dr. Thomas noted that Pulley suffered from chronic anxiety, which was currently exacerbated over the impending death of her father-in-law. Tr. 244. She temporarily increased Pulley's Xanax prescription for one month and reported that Pulley had not had any seizures while on her current dose of Dilantin. *Id*. Pulley returned for prescription refills and complaints of fibromyalgia pain in October and November 2007. Tr. 239-42. On December 18, 2007, Pulley reported that she had experienced eight seizures in the previous week despite taking Dilantin as prescribed. Tr. 237. The seizures were characterized by 45 to 90 seconds of blankness on her face and head drooping, but did not include any body shaking. *Id*.

In January 2008, neurologist Lyudmila Petruk, M.D., evaluated Pulley at Dr. Thomas' request. Tr. 262-65. Dr. Petruk indicated that Pulley presented with "very atypical seizures," and commented that her convulsions and other spells were diverse and "usually are not accompanied [by] postictal state." Tr. 264. Dr. Petruk suspected that the seizures were likely psychogenic because they were closely related to Pulley's stress level and untreated mental health issues. *Id*. However, she surmised that the seizures also may be epileptic or cardiogenic and that more investigation was necessary to properly categorize their origin. *Id*. In March 2008, Pulley underwent an MRI and EEG, both of which were normal. Tr. 261, 266. Despite the normal EEG results, Dr. Petruk could not affirmatively rule out epilepsy. Tr. 261.

On June 9, 2008, Dr. Petruk concluded that Pulley's spells and convulsions were of unknown etiology, in part because the complete work-up could not be completed due to Pulley's

5 - OPINION AND ORDER

lack of medical coverage.  Tr. 258.  However, Dr. Petruk observed that Pulley's "spells improved quite a bit after she initiated Depakote," and despite some initial side effects, her spells "improved drastically."  *Id*.  After switching medication, Pulley reported that she "finds herself fairly functional, although she continues to have rare spells."  *Id*.  Due to closure of her clinic on July 18, 2008, Dr. Petruk referred Pulley to Michael Narus, D.O., a seizure specialist in the area. Tr. 259.  At the time of the hearing, Pulley had not yet scheduled an appointment with Dr. Narus. Tr. 31.

## DISABILITY ANALYSIS

In construing an initial disability determination under Title XVI, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The

claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 416.966.

## ALJ'S FINDINGS

At step one, the ALJ concluded that Pulley has not engaged in any substantial gainful activity since the onset of her alleged disability. Tr. 13.

At step two, the ALJ determined that Pulley suffers from the following severe impairments: bipolar disorder, borderline intellectual functioning, anxiety disorder, personality disorder NOS, cannabis abuse, and seizure disorder. *Id*. The ALJ also found Pulley's possible fibromyalgia condition to be non-severe. *Id*.

At step three, the ALJ concluded that Pulley does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 14. The ALJ decided that Pulley had the RFC to perform a full range of work at all exertional levels, but with several non-

exertional limitations. *Id*. Pulley must avoid dangerous hazards such as moving machinery and heights due to her seizure disorder. *Id*. She must be limited to performing tasks with only one to three steps and cannot work with the general public. *Id*. The ALJ also limited Pulley to working around one to two other co-workers with whom Pulley could become acquainted. *Id*.

At steps four and five, the ALJ found that Pulley is capable of performing her past relevant work as a housekeeper and, based on the testimony of the vocational expert ("VE"), also could perform the jobs of basket filler, sorter of agricultural products, and hand packager. Tr. 17-18. Accordingly, the ALJ concluded that Pulley was not disabled at any point through the date of the ALJ's decision's on August 11, 2008. Tr. 18.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

///

///

**DISCUSSION**

Pulley's primary basis for claiming a permanent disability is because of the limitations imposed by her seizure disorder. Her other disabling limitations are secondary. Pulley challenges the ALJ's decision at step five of the sequential disability analysis on the sole basis that the ALJ erred by failing to pose a complete hypothetical question to the VE. Specifically, Pulley alleges that the ALJ erred by failing include Dr. Petruk's description of the severity of Pulley's seizures and Dr. Cole's conclusion that Pulley's uncontrolled seizures would significantly factor into her overall level of vocational success.

At step five, the Commissioner must show that the claimant can do other work which exists in the national economy. *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995). The Commissioner can satisfy this burden by eliciting the testimony of a VE regarding what jobs the claimant would be able to perform, given his or her RFC. *Tackett*, 180 F3d at 1101. An ALJ must propose a hypothetical that sets forth all the reliable limitations and restrictions of a claimant that are supported by substantial evidence. *Roberts v. Shalala*, 66 F3d 179, 184 (9th Cir 1995). The hypothetical must be "accurate, detailed, and supported by the record." *Tackett*, 180 F3d at 1101. "If a hypothetical fails to reflect each of the claimant's limitations supported by "substantial evidence," the expert's answer has no evidentiary value." *Osenbrock v. Apfel*, 240 F3d 1157, 1167 (9th Cir 2001), citing *Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984).

At the hearing on July 10, 2008, the ALJ posed two hypotheticals to the VE in order to solicit testimony regarding what jobs Pulley could perform given her RFC. Tr. 54. In the first hypothetical, the ALJ asked the VE to consider an individual who has a seizure disorder of unknown origin, whose only physical limitations are to take precautions to "avoi[d] hazards,

dangerous moving machinery, unprotected heights, and so on due to the potential of having a seizure." Tr. 55. Additionally, the individual could only perform simple, repetitive tasks with no more than three steps, should not work in areas that require frequent contact with the public, and would need to work with one or two other people with whom they could become acquainted. Tr. 56. Finally, the ALJ asked the VE to assume that the individual could engage in competitive employment with normal expectations of time and attendance. Tr. 57. In response, the VE testified that such an individual could not perform Pulley's past work of dishwasher or laundry attendant because of the hazards involved in those types of jobs, but could perform her past relevant work of housekeeper. *Id*. In addition, the VE testified that such a person could work as a basket filler, sorter of agricultural produce, and hand packager. Tr. 57-58. The ALJ then proposed a second hypothetical, adding that medical necessity required the individual to stay at home or rendered her unable to perform work activity for three to four days a week. Tr. 58. The VE indicated that such an additional limitation would preclude any work whatsoever. *Id*.

Relying on this testimony, the ALJ found that Pulley could perform her past relevant work of housekeeper, as well as significant numbers of jobs in the national economy and, thus, was not disabled. In so finding, the ALJ took into consideration the severe seizures that Pulley had experienced in the past and the possibility that such seizures could limit her ability to work. During the hearing, the ALJ heard testimony from Pulley, her husband, and her mother regarding the severity of her "spells." Tr. 39-40, 44-45, 49-52. They each testified that they felt Pulley must be supervised by someone at all times and that some weeks, her bad days outnumbered her good ones. *Id*. During the hearing, the ALJ advised Pulley's mother that should Pulley's condition change, or if she had an additional medical appointment, they should immediately

inform Pulley's attorney who could then notify the ALJ. Tr. 53. The ALJ also expressed concern over the fact that the neurologist had been unable to determine a cause for Pulley's seizures. Tr. 44, 51.

However, at the time of the decision, the record as a whole supports the conclusion that Pulley's seizures were largely controlled by medication and contains no medical support for Pulley's claim that she must be monitored at all times. The medical record reflects that Pulley last experienced a full convulsion seizure in February 2006. She did not report significant seizure activity again until December 2007 when she reported a series of small seizures lasting no more than two minutes in duration. Shortly thereafter, Dr. Petruk switched Pulley to Depakote, and by June 2008 Pulley reported that she was fairly functional, experiencing only rare spells. The record supports the conclusion that Pulley's seizures are largely managed by medication. When they do occur, they are mostly characterized by short periods of blankness which can be alleviated by avoiding hazards and working closely with one or two colleagues who could be aware of when such a seizure was happening.

The record further reflects that Pulley does not have any significant functional limitations other than to avoid hazardous conditions. In July 2006, Dr. Cole recommended further medical evaluation to determine how Pulley's seizures may impact specific physical limitations. Later that month, Dr. Alley completed a physical RFC assessment, noting that Pulley's seizures were largely controlled with medication, occurring once or twice a year and triggered by stress. Dr. Alley concluded that Pulley's seizure disorder would not prevent her from engaging in non-hazardous activities. Several months later, Dr. Kehrli reviewed Pulley's medical records and concurred with Dr. Alley's assessment that Pulley had no specific physical limitations.

Dr. Petruk's treatment notes suggest no potential etiology and also indicate no any specific physical limitations.

The hypotheticals posed by the ALJ appropriately accounted for the current severity of Pulley's seizure disorder as supported by the record as a whole. The first hypothetical took into account the physical limitations caused by Pulley's seizures, namely that she must avoid hazardous conditions and work around one or two other people with whom she could develop a relationship. It also took into account her intellectual and functional limitations, including avoiding contact with the general public and performing only tasks with no more than three steps. Accordingly, the ALJ's step five finding was based upon a hypothetical posed to the VE that properly accounted for all of Pulley's limitations. The hypothetical limitations reflected reasonable conclusions and were based upon reliable limitations and restrictions supported by substantial evidence in the record as a whole. Consequently, reversal or remand is not warranted.

## ORDER

For reasons stated above, the Commissioner's decision is AFFIRMED.

DATED this 17th day of December, 2009.

                                                  s/ Janice M. Stewart_____
                                                Janice M. Stewart
                                                United States Magistrate Judge